IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BMO CAPITAL MARKETS CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. _____ |
| | § | |
| UBS FINANCIAL SERVICES, INC., MILES | § | |
| C. REDFIELD, DAVID EDWARDS, ROBIN | § | |
| GAINES, AND JUSTIN COLBY; | § | |
| | § | |
| Defendants. | | |

## BMO CAPITAL MARKETS CORP.'S
## APPLICATION FOR PRELIMINARY INJUNCTION

BMO Capital Markets Corp. ("BMO") files the following Application for Preliminary Injunction against UBS Financial Services, Inc. ("UBS"), Miles C. Redfield ("Redfield"), David Edwards ("Edwards"), Robin Gaines ("Gaines"), and Justin Colby ("Colby")(collectively, "Respondents").

## I.  INTRODUCTION

1. BMO brings this application for preliminary injunction to: (1) return BMO's confidential information taken, retained, used, or shared by BMO's former employees; (2) prevent the disclosure of BMO's confidential information; (3) prevent former BMO employees from contacting BMO's clients and employees in violation of their employment agreements, BMO policies, and their fiduciary duties; and (4) preserve electronic evidence and allow non-destructive forensic imaging of computers, tablets, and mobile devices.

2. This application for preliminary injunction is in aid of a mandatory arbitration before the Financial Industry Regulatory Authority (FINRA) against its direct competitor, UBS, and four BMO employees who recently tendered their notifications of resignation, to address UBS' raiding of 15 employees from BMO's Energy Acquisitions and Divestitures group in

Houston, Texas ("BMO's Houston A&D Group").  UBS and BMO employees orchestrated the illicit recruitment and hiring of 15 members of BMO's Houston A&D Group.  In the process, Respondents breached their fiduciary duties, violated their employment agreements and BMO policies, or encouraged others to breach their fiduciary duties or violate their employment agreements amd BMO policies, by impermissibly soliciting BMO clients and employees or improperly taking BMO's confidential and proprietary information.

3.      Following the resignations of Miles Redfield, David Edwards, Robin Gaines, and Justin Colby (collectively, the "Individual Respondents"), BMO collected and reviewed email communications contained on BMO servers.  BMO's information technology department also gathered and reviewed computer activity logs of the employees who resigned.  After reviewing thousands of email communications and computer activity logs, it is apparent that the Individual Respondents or those they recruited, engaged in the unauthorized access, retention, or sharing of BMO's confidential and proprietary information.  BMO has requested that Redfield, Edwards, Gaines, and Colby provide access to their personal computers, tablets, and mobile devices for forensic imaging and backup in order to preserve evidence and allow review as agreed upon or ordered by the Court, but the Individual Respondents have thus far failed to tender devices for inspection.

4.      This Application is supported by the Declaration of Jon Marinelli, which is attached hereto as **Exhibit A** and incorporated by reference herein as though fully set forth.

## II. DISCOVERY

5.      BMO has filed an Emergency Motion for Expedited Discovery and an Emergency Motion for Preservation of Electronic Documents contemporaneous with this Application.

### III.  PARTIES

6.      BMO is a corporation organized under the laws of the State of Delaware.  BMO is engaged in the business of providing financial and investment services, and has offices in the State of Texas.  At all relevant times BMO was engaged in the investment banking business in Houston, Texas.

7.      UBS is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of New Jersey.  UBS is engaged in the business of providing financial and investment services, and has offices in the State of Texas.  At all relevant times UBS was engaged in the investment banking business in Houston, Texas.

8.      Redfield is an individual and a current employee of BMO who tendered notification of his resignation on March 6, 2015.  Upon information and belief, Redfield is an individual citizen of Texas and resident of Harris County, Texas.  His home address is 1325 Ashland Street, Houston, Texas 77008.

9.      Edwards is an individual and a current employee of BMO who tendered notification of his resignation on March 6, 2015.  Upon information and belief, Edwards is an individual citizen of Texas and resident of Harris County, Texas.  His home address is 6214 Linton Rd, Houston, Texas 77008.

10.      Gaines is an individual and a current employee of BMO who tendered notification of her resignation on March 6, 2015.  Upon information and belief, Gaines is an individual citizen of Texas and resident of Harris County, Texas.  Her home address is 5510 Greenheath Lane, Katy, Texas 77450.

11.      Colby is an individual and a current employee of BMO who tendered notification of his resignation on March 9, 2015.  Upon information and belief, Colby is an individual citizen

of Texas and resident of Harris County, Texas.  His home address is 13914 Hickory Meadow Court, Houston, Texas 77004.

## IV.  JURISDICTION AND VENUE

12.     The Court has jurisdiction under 28 U.S.C. § 1331 because one of BMO's claims arises under federal law: the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  The Court has jurisdiction over BMO's other claims in this lawsuit pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in this district pursuant to the provisions of 28 U.S.C. §§ 1391(a)(2) and 1391(b), because a substantial part of the events giving rise to these claims occurred in this district.

## V.  FACTS

14.     This dispute arises out of UBS' hiring of 15 employees from BMO's Houston A&D Group.

### A.     BMO's successful Houston A&D Group.

15.     BMO's Houston A&D Group consisted of nineteen (19) professionals with years of experience facilitating oil and gas asset sales, purchases and joint ventures, and valuation work on behalf of energy companies.  In addition, BMO's Houston A&D Group also worked closely with the rest of BMO's U.S. Energy Group, providing insight on and valuation perspectives on oil and gas assets for use in the marketing and execution of other capital markets transactions, M&A transactions, and corporate banking transactions.

16.     In the last five years, BMO's Houston A&D Group had been a successful group generating significant revenues for BMO.

**B.**     **BMO's relationship with its employees.**

17.     BMO has invested substantial resources in hiring and training employees, and that included benefits to officers, operating personnel, and other employees in BMO's Houston A&D Group.  The compensation packages and promotions given by BMO to members of its Houston A&D Group included employment agreements providing terms and conditions customary in the industry.

18.     Redfield was hired by BMO in November 2009 to be the Managing Director and Head of BMO's Houston A&D Group.

19.     Edwards was hired by BMO in August 2010 as an Associate, was later promoted to Vice President, and then was subsequently promoted to the position of Director in BMO's Houston A&D Group.

20.     Gaines was hired by BMO in April 2013 as a Vice President in BMO's Houston A&D Group.

21.     Colby was hired by BMO in January 2014 as a Vice President in BMO's Houston A&D Group.

**C.**     **The Individual Respondents' employment agreements and BMO policies prohibit solicitation of BMO's clients and employees.**

22.     The Individual Respondents' employment agreements and BMO policies generally prohibit the Individual Respondents from engaging in any activity that would create a conflict of interest with BMO.  In pertinent part, the employment agreements provide the following: "[w]hile employed by [BMO], [the employee] will not engage in any other business or employment without prior written consent from [BMO]…In other words, conflicts of interest . . . are prohibited."

23.     The Individual Respondents' employment agreements and BMO policies also strictly prohibit the Individual Respondents from attempting to solicit, inducing, or attempting to induce BMO customers or clients to stop doing business with BMO or to do business with any other company for a period of ninety (90) days after the date of termination of employment:

> In the event you voluntarily leave your employment with [BMO], you agree that for a period of ninety (90) days after the date of termination of your employment ("termination date"), with respect to any customer of [BMO] with whom you dealt, serviced, had contact with, had responsibility for or had access to confidential information regarding, you will not: (a) solicit, induce, or attempt to induce such customer to stop doing business with or through [BMO], or to do business with any other person, firm, partnership, corporation or other entity that provides products or services competitive with those provided by [BMO]; or (b) provide service to such customer which is competitive to the services provided by [BMO].

24.     In addition to the prohibition against the solicitation of BMO's customers, the employment agreements and BMO policies expressly prohibit the Individual Respondents from recruiting other BMO employees to leave BMO for a period of 6 months after the date of termination of employment:

> You will not . . . for a period of six (6) months. . . either directly or indirectly, for you or for any third party, solicit, induce, recruit, or cause another person in the employ of [BMO] to terminate his/her employment for the purpose of joining, associating, or becoming employed with another firm or business which is in competition with any product sold by [BMO], or any business or activity of [BMO].

25.     In addition to the restrictions in their employment agreements, the Individual Respondents owe BMO fiduciary duties, including the duty of loyalty.   The Individual Respondents' fiduciary duties would also prohibit the Individual Respondents from soliciting BMO's clients and employees on behalf of UBS while employed by BMO.

**D.     BMO trusted the Individual Respondents with confidential information.**

26.     The Individual Respondents, as well as the other departing employees, were entrusted with BMO's confidential information.   BMO's confidential and proprietary information included, among other things, business strategies and models, operating models,

client lists, client targets, financial information, financial forecasts and projections, company pitch materials, transaction execution materials, and analyses.  BMO's computers are used in interstate commerce, and thus are "protected computers," because BMO conducts business both nationally and internationally.

27.     Immediately prior to their resignations, the Individual Respondents sent confidential BMO information to their personal email accounts or maintained confidential BMO information on their personal computers.  For example, based upon emails on BMO devices, it appears that Redfield had the following highly confidential documents on his personal computer:

- All or part of a document titled "U.S. A&D Analysis of Transactions from 2010 to 2014."  The document was marked "Confidential" and "Internal Use Only" on its face.  The confidential document, prepared by BMO employees under Redfield's direction, contains a detailed analysis of BMO's U.S. A&D Group over the last five years and includes highly confidential client information, pitch analysis, business opportunities, and other confidential information.

- "Retention Bonus Proposal."  This highly confidential document included names, titles, base salaries, year-end bonuses, and proposed retention bonuses for the members of BMO's Houston A&D Group.

- "MCR White Paper, US Advisory Business."  This internal strategy document contained detailed information regarding BMO compensation, client initiatives, and business development strategies.

28.     Upon information and belief, Redfield shared information contained in these confidential BMO documents directly or indirectly with UBS.  A number of the departing employees were recruited into positions at least one title higher than their current BMO positions.  These promotions match those outlined in a confidential, proposed BMO Organizational Chart.   Additionally, upon information and belief, the compensation UBS offered was slightly above the confidential BMO retention plan discussed between BMO and Redfield.  Upon information and belief, UBS received confidential BMO information from

Redfield that allowed it to offer these promotions and pay raises to the BMO departing employees.

29. BMO's computer logs recorded the actions taken by the Individual Respondents on their BMO computers. Based upon the computer activity logs, it appears that the Individual Respondents improperly accessed large amounts of BMO's confidential information just prior to their resignations. The computer activity logs reveal that:

- Redfield accessed significant amounts of BMO's confidential information, including historical transactions, prospective client deals, and organizational structure in the days and weeks before he left. For example, on the day Redfield resigned, he accessed BMO's confidential documents "2015 FY In Progress," "2014 projects," and "2013 projects."

- Edwards accessed highly confidential and proprietary documents in the days before he resigned, including BMO's acquisitions and divestitures database, proprietary production maps, and deals in the market. Edwards also accessed documents labeled "2012 projects," "2013 projects," "2014 projects," and "2015 projects," on March 5, 2015, the day before he resigned.

- Colby accessed highly confidential and proprietary documents in the days before he resigned on March 9, 2015. Colby also accessed hundreds of documents in the days before he resigned.

- Gaines accessed "2013 projects" and "2014 projects" on March 5, 2015, the day before she resigned.

30. The Individual Respondents did not access these documents in the normal course of business. If these documents were not accessed for BMO business, the Individual Respondents' actions were in violation of BMO's employment agreements and confidentiality policies, and exceeded the Individual Respondents' authorized access to BMO confidential documents.

31. In addition, building security logs that track when employees enter BMO's offices in Houston reveal that Colby entered and exited BMO's offices four times on the evening of Sunday, March 8, 2015—the day before he resigned. The building security logs also reveal that

several of the other employees who resigned made multiple trips in and out of BMO's Houston offices on Sunday March 8, 2015, and in the early morning hours on Monday, March 9, 2015 before they resigned.

32.     The Individual Respondents violated BMO's policies and contracts by accessing the computer network, acting against BMO's interest, and taking or retaining its confidential information. Indeed, by their conduct, the Individual Respondents acted outside the course and scope of their employment – actually contrary to the course and scope of their employment – when they knowingly acted adversely to BMO's interests.  This conduct was obviously contrary to the intended use of BMO's computer system.

33.     Respondents' conduct caused BMO damages because BMO had to retain computer forensic experts to collect and preserve confidential information and attempt to determine the extent of Respondents' unauthorized conduct.  The cost of this collection and recovery will easily exceed $5,000.

34.     Viewed together, the Individual Respondents' emailing of confidential information to their personal email addresses, accessing large volumes of confidential information shortly before their resignations, and weekend trips in and out of BMO's Houston office, it can only reasonably be expected that the Individual Respondents intend to use BMO's confidential information for UBS' benefit.  Upon information and belief, the Individual Respondents, or those they recruited, shared BMO's confidential and trade secret information with UBS during their negotiations with UBS, and eventually provided this information to UBS, or have the confidential information in their possession with the intent to share it with or provide it to UBS.  All of this information was of such a confidential and sensitive nature that disclosing it to a competitor would put BMO at a competitive disadvantage.

       **E.**     **The Individual Respondents and UBS conspired to raid BMO's employees.**

35.     The Individual Respondents orchestrated the illicit recruitment and hiring of the substantial majority of BMO's Acquisitions and Divestitures Group in Houston, Texas ("BMO's Houston A&D Group"). In the process, the Individual Respondents violated their employment agreements or BMO company policies, or breached their fiduciary duties, or encouraged others to violate their employment agreements or BMO policies, or to breach fiduciary duties owed to BMO by impermissibly soliciting BMO employees.

36.     Despite their contractual obligations and fiduciary duties, some or all of the Individual Respondents helped UBS hire 15 employees from BMO's Houston A&D Group. BMO's Houston A&D Group previously consisted of 19 professionals with years of experience facilitating oil and gas asset sales, purchases and joint ventures, and valuation work on behalf of energy companies. In addition, BMO's Houston A&D Group also worked closely with the rest of BMO's U.S. Energy Group, providing insight on and valuation perspectives on oil and gas assets for use in the marketing and execution of other capital market transactions, M&A transactions and corporate banking transactions. Upon information and belief, UBS, with the assistance of the Individual Respondents, recruited and hired BMO employees collectively, rather than making individual decisions with respect to the hiring of each of them, in order to start an energy-focused A&D Group in Houston where it previously had no presence or significant expertise.

37.     Based on the email communications and text messages that occurred on BMO computers and devices, it appears that UBS began communicating with the Individual Respondents both directly and through a recruiter in October 2014. The communications BMO has collected reveal that:

- On November 1, 2014, Rob Pierce, UBS' Managing Director and Americas Head of Midstream and MLP Investment Banking, had his first meeting with Redfield. When Redfield asked in a text message why his group should leave BMO to join UBS, Mr. Pierce told him, "UBS can offer you *and your team* far more than BMO will ever be able to."  [emphasis added]

- On December 8, 2014, in an text message exchange between Redfield and Edwards, Edwards stated, "If [Mr. Pierce] and Tom [Langford] have a mandate to grow the business, you know they will be successful."

- On December 17, 2014, UBS interviewed another managing director of BMO's Houston A&D Group.  That same day, Redfield sent multiple text messages to the BMO managing director asking how the "discussion with [UBS'] Tom [Langford]" had gone.

- On December 20, 2014, Robin Gaines, a vice president in the group, had a two-hour breakfast meeting with Mr. Pierce to discuss opportunities at UBS.  Redfield later relayed via text message to Edwards that Gaines' breakfast meeting with Mr. Pierce "went very well."  That same day, Edwards also sent text messages to Redfield asking about the status of another BMO director.

38.    The *en masse* exit plan was in motion.  The Individual Respondents had a core team ready to move to UBS, and turned their efforts to recruitment of the balance of BMO's Houston A&D Group.

39.    Shortly before Christmas, Redfield requested that his telephone number be transferred from a BMO device to a personal device, which has to be approved by BMO.  After reviewing some text messages indicating conversations between Redfield and UBS, Jon Marinelli, Managing Director and Head of the BMO Capital Markets U.S. Energy Group, asked Redfield if he was in discussions with UBS regarding possible employment.  Redfield admitted he was.  No text messages have been located on Redfield's BMO device after January 5, 2015.  After Mr. Marinelli's conversation with Redfield all text messages, emails or other communications with UBS, the headhunter, the other Individual Respondents, and other BMO employees about leaving BMO and joining UBS were on Redfield's personal device or email.

40.     Respondents proceeded with targeted efforts to recruit and solicit BMO's Houston A&D Group, together with the confidential information and experience that these individuals held as trusted employees.  Redfield and Edwards also discussed the recruitment of other BMO employees.  Upon information and belief, UBS had knowledge of, and in fact encouraged Redfield, to violate his Employment Agreement and breach his fiduciary duties to BMO by recruiting other BMO employees to UBS.  Upon information and belief, Redfield negotiated with UBS regarding positions, titles, and salaries for various members of BMO's Houston A&D Group, including BMO directors, vice presidents, associates, and analysts using BMO's confidential information.

**F.     UBS raided BMO's Houston A&D Group.**

41.     After what appears to have been months of planning, Redfield submitted his letter of resignation on Friday, March 6, 2015.  Approximately thirty minutes later, Edwards and Gaines, who had sequestered themselves in a BMO conference room, jointly notified Jon Marinelli of their resignations.  Colby solicited other BMO employees over the weekend, and on Monday after he resigned, to leave BMO for UBS.

42.     Upon information and belief, the Individual Respondents helped UBS raid BMO's Houston A&D Group, including disclosing highly confidential information about BMO employees such as titles, compensation, what would be required to recruit the employees to UBS, and those people that the Individual Respondents viewed as essential for UBS to hire. Upon information and belief, offers to junior team members had already been prepared, and were conveyed over the weekend.  None of this could have occurred without all or some of the Individual Respondents providing key information regarding the employees and their compensation to UBS in advance.

43.     On Monday, March 9, 2015, ten (10) more employees resigned

44.     By Tuesday, March 10, 2015, fifteen (15) of the nineteen (19) members of BMO's Houston A&D Group had resigned.

45.     Pursuant to his employment agreement, Redfield has a 90-day notice period, during which time Redfield remains a BMO employee and is prohibited from starting employment with UBS (or any other competitor).  Edwards is also subject to notice provisions under which he is prohibited from starting employment with UBS (or any other competitor) for 60 days.  Gaines and Colby are also subject to notice provisions under which they are prohibited from starting employment with UBS (or any other competitor) for 30 days.  Upon information and belief, all four Individual Respondents will formally begin their employment with UBS upon the expiration of their respective BMO notice periods.

46.     Upon information and belief, UBS is paying the Individual Respondents (and possibly other former BMO employees) millions of dollars in guaranteed bonuses and other compensation, as well as providing indemnification for certain of the former BMO employees.

**G.      Contact with Clients.**

47.     The Individual Respondents' Employment Agreements, BMO policies, and the Individual Respondents' fiduciary duties to BMO prohibit the Individual Respondents from engaging in any activity that would create a conflict of interest with BMO, including attempting to solicit, inducing, or attempting to induce BMO customers or clients to stop doing business with BMO or to do business with any other company.

48.     In mid-February 2015, Redfield held a meeting with a BMO client for which Jon Marinelli is the relationship manager.  Despite BMO's standard practices, Redfield did not inform Mr. Marinelli of the meeting either before or after it occurred. Mr. Marinelli only learned of the meeting when a different group of BMO employees met with the client the following

week.  This is particularly egregious because Redfield and the other Individual Respondents were negotiating with UBS regarding potential employment at the same time.

49.     Upon information and belief, the Individual Respondents (either directly or indirectly through Associates), have continued to contact current and former BMO clients.

## VI.  CAUSES OF ACTION

50.     As referenced above, the claims in this case are subject to mandatory arbitration before FINRA.  Accordingly, all claims for monetary damages and permanent injunctive relief will be submitted for determination on the merits by the FINRA arbitration panel.

## COUNT ONE

## Breach of Contract

### (as to Respondents Redfield, Edwards, Gaines, and Colby)

51.     BMO incorporates by reference and re-alleges each allegation contained in the above-numbered paragraphs.

52.     Despite the contractual prohibitions agreed to by Redfield, Edwards, Gaines, and Colby, they have violated the terms of their employment agreements with BMO.  The employment agreements explicitly prohibit the Individual Respondents from engaging in any conduct that would be a conflict of interest, and prohibit the solicitation of any BMO customer or client after the termination of their employment.  These restrictions are intended to protect BMO's significant goodwill investment, industry reputation, and its substantial relationships with its clients.

53.     Upon information and belief, the Individual Respondents breached their employment agreements by contacting current or former BMO clients with the intent to induce BMO clients to stop doing business with BMO or to do business with UBS.

54.     The Individual Respondents breached the employment agreements by recruiting BMO employees with the intent of convincing employees to resign from BMO to be employed by BMO's direct competitor, UBS.

55.     The Individual Respondents breached the employment agreements by improperly accessing, using, retaining, or sharing BMO's confidential and proprietary information.

56.     BMO has been and continues to be damaged in an undetermined amount of damages to its business including, but not limited to, lost profits, loss of clients, loss of employees, and loss of further business opportunities.  Furthermore, as a direct and proximate result of the Individual Respondents' conduct, BMO has suffered or will suffer immediate and irreparable harm.

## COUNT TWO

## Tortious Interference with Contract and With Prospective Business Relations

### (as to Respondent UBS)

57.     BMO incorporates by reference and re-alleges each allegation contained in the above-numbered paragraphs.

58.     UBS has and continues to intentionally and wrongfully interfere with BMO's contracts with its employees and relationships with its clients.

59.     UBS hired the Individual Respondents with the intent that they recruit other employees from BMO in violation and clear breach of the employment agreements and with the intent to harm BMO's ability to retain its employees.  Based upon industry standards and UBS' own practices, UBS knew or should have known of the existence of the employment agreements, and tortiously interfered with them by hiring the Individual Respondents with the intent that they recruit employees from BMO in violation of those employment agreements.

60.      Moreover, UBS hired the Individual Respondents with the intent that they take business from BMO in violation and clear breach of the employment agreements and with the intent to harm BMO's ability to retain its clients.  UBS' interference is causing or has the potential to cause BMO's clients to consider cancelling, withdrawing or transferring their business from BMO.  Based upon industry standards and UBS' on practices, UBS knew or should have known of the existence of the employment agreements, and tortiously interfered with them by hiring the Individual Respondents with the intent that they take business from BMO in violation of those employment agreements.  UBS' conduct is unjustified and constitutes tortious interference with BMO's existing contracts and business relationships.

61.      BMO has been and continues to be damaged by UBS' actions and conduct in an undetermined amount of damages to its business including, but not limited to, lost profits, loss of clients, loss of employees, and loss of further business opportunities.  Furthermore, as a direct and proximate result of UBS' conduct, BMO has suffered or will suffer immediate and irreparable injury for which there is no adequate remedy at law.

## COUNT THREE

### BREACH OF FIDUCIARY DUTY

**(as to Respondents Redfield, Edwards, Gaines, and Colby)**

62.      BMO incorporates by reference and re-alleges each allegation contained in the above-numbered paragraphs.

63.      As employees of BMO, the Individual Respondents owed BMO fiduciary duties of loyalty, good faith, and due care.

64.      By committing the acts alleged, the Individual Respondents have breached their fiduciary duties by, among other things:

- using assets and confidential information gained in connection with their employment or involvement with BMO for personal gain and/or for the benefit of UBS to compete and interfere with BMO's business.

- soliciting or inducing, or attempting to solicit or induce, BMO's clients on behalf of UBS; or

- recruiting or soliciting, or attempting to recruit or solicit, other BMO employees on behalf of UBS;

65.     As a direct and proximate result of the Individual Respondents' breach of their fiduciary duties, the Individual Respondents have improperly benefitted at BMO's expense. BMO has been and continues to be damaged by the Individual Respondents' actions and conduct in an undetermined amount of damages to its business including, but not limited to, lost profits, loss of clients, loss of employees, and loss of further business opportunities.

66.     The Individual Respondents' conduct is unjustified and constitutes breach of their fiduciary duties.  As a direct and proximate result of the Individual Respondents' conduct, BMO has suffered or will suffer immediate and irreparable injury for which there is no adequate remedy at law.

## COUNT FOUR

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (as to Respondent UBS)

67.     BMO incorporates by reference and re-alleges each allegation contained in the above-numbered paragraphs.

68.     The Individual Respondents and other resigning BMO employees owed BMO fiduciary duties.  The Individual Respondents and, potentially, other employees breached those duties with the full knowledge and substantial assistance of UBS.

69.     UBS aided and abetted, and was an active and knowing participant, in the Individual Respondents' and, potentially, other departing employees' breaches of their fiduciary duties.  As set forth above, UBS' Rob Pierce communicated with Redfield while he still owed fiduciary duties to BMO in an attempt to encourage other BMO employees to join UBS. Accordingly, UBS' participation in the departing BMO employees' underlying breach of fiduciary duty was with full knowledge that its participation would assist the Individual Respondents and others in breaching their fiduciary duties to BMO.

70.     As a direct and proximate result of departing BMO employees' breach of their fiduciary duties to BMO and of UBS's aiding and abetting that breach, BMO has been and continues to be damaged by UBS' actions and conduct in an undetermined amount of damages to its business including, but not limited to, lost profits, loss of clients, loss of employees, and loss of further business opportunities.

71.     UBS' conduct is unjustified and constitutes aiding and abetting the departing BMO employees' breach of their fiduciary duties.  As a direct and proximate result of UBS' conduct, BMO has suffered or will suffer immediate and irreparable injury for which there is no adequate remedy at law.

## COUNT FIVE

### VIOLATION OF THE COMPUTER FRAUD & ABUSE ACT 18 U.S.C. § 1030.

#### (as to Respondents Redfield, Edwards, Gaines, and Colby)

72.     BMO incorporates by reference and re-alleges each allegation contained in the above-numbered paragraphs.

73.     The Computer Fraud and Abuse Act ("CFAA") applies to any computers used in interstate commerce and provides that "[a]ny person who suffers damage or loss by reason of a

violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." *See* 18 U.S.C. § 1030(g).

74.     The civil action provision applies whenever a person: (1) intentionally accesses a computer without authorization or exceeds authorized access and thereby obtains information from any protected computer (18 U.S.C. § 1030 (a)(2)(C)); (2) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value (18 U.S.C. § 1030 (a)(4)); or (3) knowingly causes the transmission of a command, and as a result of such conduct intentionally causes damage without authorization to a protected computer, or intentionally accesses a protected computer without authorization and causes damage or loss (18 U.S.C. § 1030 (5)(A), (B), or (C)).

75.     BMO's computers are used in interstate commerce, and thus "protected computers."

76.     The Individual Respondents violated BMO policies and contracts by accessing BMO's computer network, acting against BMO's interest, and taking or retaining BMO's confidential information.  Accordingly, they acted "without authorization" for purposes of all of the pertinent provisions of the CFAA, or "exceed[ed] authorized access" for purposes of all of the pertinent provisions of the CFAA.  Indeed, by their conduct, the Individual Respondents acted outside the course and scope of their employment – actually contrary to the course and scope of their employment – when they knowingly acted adversely to BMO's interests.  This conduct was obviously contrary to the intended use of BMO's computer system.

77.     Respondents' conduct caused BMO damages because BMO has had to retain computer forensic experts to recover the lost data and attempt to determine the extent of Respondents' unauthorized conduct.  The cost of this recovery will easily exceed $5,000.

78.     BMO seeks injunctive relief, as set forth below, requiring the Respondents to return its property and information, retain no copies, and produce all devices and computers on which its property and information has been copied, placed, stored, transferred or maintained to the custody of Pathway Forensics for preservation and inventory.  BMO also seeks injunctive relief, as set forth below, requiring Respondents to identify in writing any BMO property or information they have taken, any evidence they have destroyed and any persons with whom they have shared and/or disclosed BMO's property or information.

## VII.  APPLICATION FOR PRELIMINARY INJUNCTION

79.     BMO incorporates by reference and re-alleges each allegation contained in the above-numbered paragraphs.

80.     BMO moves the Court for the entry of a Preliminary Injunction to maintain the status quo, and to prevent UBS or anyone acting in concert or active participation with it, including without limitation any departing BMO employee, including without limitation Miles Redfield, David Edwards, Robin Gaines, Jennifer Covey, Justin Colby, Erin Fox, Robert Mitchell, Kayla Doughtery, Megan Jaeger, Kate Powell, Jessica Debate, Kyle Ray, William Loweth, Linda Fair, and/or Zara Tariq from utilizing BMO confidential and proprietary information, further soliciting BMO's Houston A&D Group clients, or any other current or former BMO employees.

81.     BMO has shown a probability of recovery on the merits based on Respondents' improper utilization of BMO's confidential information, breach of their respective employment

agreements, breach of their fiduciary duties, or their involvement and assistance with such breaches.

82.     BMO faces probable imminent and irreparable injury for which there is no adequate remedy at law. The harm that will be caused to BMO by the Individual Respondents' improper utilization of BMO's confidential information, breach of any applicable Employment Agreement, breach of fiduciary duties, or by UBS' facilitation of those breaches, is imminent because UBS is a competitor of BMO. Should injunctive relief not be entered, in all probability Respondents will continue to interfere with BMO's contracts and business, by soliciting clients of BMO's Houston A&D Group, improperly utilizing BMO's confidential information, and by facilitating further breaches by the Individual Respondents and other departing BMO employees, including without limitation Miles Redfield, David Edwards, Robin Gaines, and Justin Colby. Such interference will permanently impair and irreparably harm the effectiveness of BMO's Houston A&D Group and its ability to compete in the marketplace, a harm that is difficult to measure and which cannot be readily repaired. Therefore, absent injunctive relief by this Court, BMO will suffer irreparable injury for which there is no adequate remedy at law.

83.     BMO is ready and willing to post a bond as required by law.  For the reason stated herein, BMO respectfully requests that the Court enter a Preliminary Injunction enjoining Respondents, individually and jointly, their agents, employees, officers, representatives, and attorneys, and those in active concert or participation with them who receive actual notice of the Preliminary Injunction Order from:

- Disclosing any confidential or proprietary information regarding BMO, its clients, and its working relationships with its clients to any third party, including to UBS and requiring that any confidential BMO information in their possession be returned to BMO;

- Soliciting any BMO customer with whom the Individual Respondents dealt,

serviced, had contact with, had responsibility for or had access to confidential information regarding, for their own benefit and/or for the benefit of BMO's competitor, UBS; and

- Starting employment with UBS during the notice period provided in the employment agreements of Miles Redfield, David Edwards, Robin Gaines, and Justin Colby.

- Soliciting any BMO employees in violation of the Individual Respondents' employment agreements or BMO policies.

84.     Severe harm will be sustained by BMO if Respondents are not restrained as requested.

85.     For the reasons stated above, BMO moves the Court for the entry of a Preliminary Injunction against the Respondents, individually and jointly, and their agents, employees, officers, representatives, and attorneys, and those in active concert or participation within them, including any other employees who resigned from BMO's Houston A&D Group to join UBS, who receive actual notice of such Preliminary Injunction to maintain the status quo.

86.     BMO is entitled to injunctive relief as it has satisfied the standards necessary for such relief.   BMO requests the Court set a hearing for preliminary injunction, and that Respondents should appear and show cause why a preliminary injunction should not be issued.

## VIII.  <u>PRAYER FOR RELIEF</u>

BMO Capital Markets Corp. prays that a Preliminary Injunction be issued against Respondents Miles Redfield, David Edwards, Robin Gaines, Justin Colby, and UBS that:

1.  Restrains Respondents, directly or indirectly, their employees, agents, contractors, sub-contractors, present and former attorneys, and assigns, whether alone or in concert with others, including any officer, agent, representative, and/or employee of Respondents and those in active concert or participation with Respondents, including any other employees who resigned from BMO's Houston A&D Group

to join UBS, from soliciting, by any means, any BMO customer with whom the Individual Respondents dealt, serviced, had contact with, had responsibility for or had access to confidential information regarding.

2. Orders that Respondents identify all customers or clients of BMO with whom Respondents directly or indirectly, their employees, agents, contractors, sub-contractors, present and former attorneys, and assigns, whether alone or in concert with others, including any officer, agent, representative, and/or employee of Respondents and those in active concert or participation with Respondents, including any other employees who resigned from BMO's Houston A&D Group to join UBS, have contacted;

3. Restrains Miles Redfield, David Edwards, Robin Gaines, and Justin Colby from commencing employment with UBS prior to the expiration of the notice periods contained in their respective employment agreements;

4. Restrains Respondents from accessing, using, or sharing any BMO property or information, whether in electronic, hard copy form, or any other form including, but not limited to, the contact information for any BMO customer with whom the Individual Respondents dealt, serviced, had contact with, had responsibility for or had access to confidential information;

5. Orders that Respondents return any and all BMO property or information, whether in electronic, hard copy form, or any other form, in their possession, custody or control including, but not limited to, the contact information for any BMO customer with whom the Individual Respondents dealt, serviced, had contact with, had responsibility for or had access to confidential information;

6. Restrains Respondents, directly or indirectly, their employees, agents, contractors, sub-contractors, present and former attorneys, and assigns, whether alone or in concert with others, including any officer, agent, representative, and/or employee of Respondents and those in active concert or participation with Respondents, including any other employees who resigned from BMO's Houston A&D group to join UBS, from destroying, wasting, injuring, mistreating, altering, removing or disposing of any documents or tangible things, whether in hard copy, electronic, contained on a computer or computer storage device, or any other form or format (in their possession custody or control or which they access or utilize), containing information reasonably calculated to lead to the discovery of any evidence relevant to this Application.

7. Restrains Respondents, directly or indirectly, their employees, agents, contractors, sub-contractors, present and former attorneys, and assigns, whether alone or in concert with others, including any officer, agent, representative, and/or employee of Respondents and those in active concert or participation with Respondents, including any other employees who resigned from BMO's Houston A&D Group to join UBS,  from contacting, by any means, any employees of BMO.

Respectfully submitted,


   */s/ Retta A. Miller*    
**Retta A. Miller**
**Attorney-in-Charge**
State Bar No. 14106700
S.D. I.D. No. 14313
rmiller@jw.com
**Christopher R. Bankler**
State Bar. No. 24066754
S.D. I.D. No. 1452954
cbankler@jw.com
**JACKSON WALKER L.L.P.**
901 Main Street, Suite 6000
Dallas, Texas 75202
Phone:  (214) 953-6000
Fax:  (214) 661-5822

**Paula Denney**
State Bar No. 05746950
S.D. I.D. No. 10063
pdenney@jw.com
**Richard A. Howell**
Texas Bar No. 24056674
S.D. I.D. # 959050
rahowell@jw.com
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Phone:  (713) 752-4200
Fax:  (713) 752-4221


**ATTORNEYS FOR**
**BMO CAPITAL MARKETS CORP.**